*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellant,

v

WALTER JOSEPH CASWELL,

Defendant-Appellee.

FOR PUBLICATION
November 24, 2025
12:24 PM

No. 368232
Mackinac Circuit Court
LC No. 23-004360-AR

Before: FEENEY, P.J., and BORRELLO and LETICA, JJ.

FEENEY, P.J.

The prosecution appeals by leave granted[1] the circuit court order affirming the district court's dismissal of defendant's charges of spear fishing in a closed stream in violation of MCL 324.48711 and MCL 324.48715.[2] This is the second time that this case is before this Court. See *People v Caswell*, 336 Mich App 59; 969 NW2d 538 (2021). This case began in October 2018 when a Department of Natural Resources (DNR) conservation officer cited defendant for spear fishing in a closed stream. *Id*. at 62. Defendant moved to dismiss the charges on the ground that he was a tribal member with hunting and fishing treaty rights. *Id*. The district court agreed, but the circuit court reversed. *Id*. at 63. On appeal, this Court addressed, as a matter of first impression, "the proper legal framework in which to assess whether a defendant is entitled to assert their tribal status as a defense to state fishing regulations." *Id*. at 67. After establishing the proper framework, this Court remanded the matter to the district court for an evidentiary hearing to allow defendant

---

[1] *People v Caswell*, unpublished order of the Court of Appeals, entered March 22, 2024 (Docket No. 368232).

[2] As this Court previously noted: "MCL 324.48715 was repealed by 2018 PA 529, effective December 28, 2018. However, at the time of the offenses, the statute was in effect. MCL 324.48711 was amended by 2018 PA 529 as well, but the changes were mainly editorial and do not affect this case." *People v Caswell*, 336 Mich App 59, 62 n 1; 969 NW2d 538 (2021).

to present evidence. *Id*. at 75-78. After the evidentiary hearing on remand, the district court upheld its dismissal of defendant's charges and the circuit court affirmed. We affirm.

## I. THE PRIOR APPEAL

This Court, in its prior decision, set forth the pertinent facts and procedures that led to this case, many of which are undisputed:

> In the Treaty of 1836, a group of Indian tribes, collectively referred to as the Ottawa (or Odawa) and Chippewa Nations, ceded to the federal government nearly 14 million acres in what is now Michigan's eastern Upper Peninsula and western Lower Peninsula. *People v LeBlanc*, 399 Mich 31, 38; 248 NW2d 199 (1976). The treaty preserved the tribes' rights to hunt and fish on the ceded lands. *Id*. at 38, 41. In the Treaty of 1855, the federal government dissolved the concept of an Odawa/Chippewa Nation and addressed reservation boundaries regarding several different tribes. *Mackinac Tribe v Jewell*, 829 F3d 754, 755; 424 US App DC 236 (2016). The 1855 treaty did not affect the fishing rights retained in the 1836 treaty. See *LeBlanc*, 399 Mich at 55-58.

> During the next 150 years, disputes arose concerning the hunting and fishing rights under the treaties. In an attempt to resolve disputes regarding inland treaty rights (as opposed to fishing rights on the Great Lakes), the Michigan DNR signed a hunting and fishing consent decree in 2007 with five federally recognized tribes. The decree, known as the 2007 Inland Consent Decree (Consent Decree), defines the extent of inland hunting, fishing, and gathering rights for tribal members. Under the Consent Decree, the tribes generally regulate hunting and fishing seasons for their tribal members and may also regulate hunting and fishing methods, including spear fishing.

> Defendant was spear fishing in a Mackinac County stream within the ceded lands subject to the Consent Decree when the conservation officer cited him for fishing in a trout stream out of season and fishing by illegal means. At the time, defendant had a fishing license issued by the state of Michigan, but the license did not allow spearfishing or fishing out of season. Defendant also had a tribal fishing card issued by the Mackinac Tribe, which apparently allowed spearfishing and had no seasonal limitation.

> As indicated, defendant moved to dismiss the charges on the ground that he is a member of a tribe with hunting and fishing treaty rights. At the hearing on the motion to dismiss, the DNR conservation officer testified that the state of Michigan does not accept the Mackinac Tribe's assertion of treaty rights because the Mackinac Tribe was not a signatory to the Consent Decree. The officer testified that only members of the five tribes that signed the Consent Decree could hunt, fish, and gather in the area ceded to Michigan in the 1836 treaty and that he did not believe the Mackinac Tribe was associated with any of those five tribes.

Barry Wallace Adams testified on defendant's behalf. He identified himself as the "Chairman of the Mackinac Tribe of Odawa," which was referred to as the Mackinac Tribe, and he affirmed that defendant was a member of the tribe. He testified that the Mackinac Tribe was descended from "Ainse Band . . . . Band 15 and 16, Point[e] of St. Ignace, and the Band 16 is Pointe of Aux Chenes" and that it was a signatory to the 1836 and 1855 treaties.[3] He indicated that the modern-day Mackinac Tribe consisted of Ojibwa excluded from the Sault Ste. Marie Tribe of Chippewa Indians after it closed its rolls. It is not clear from Adams's testimony when or under what precise circumstances this occurred.

Defendant also submitted three documents for admission as exhibits. He first submitted a copy of his "Tribal Subsistence Harvesting License." The license was issued by the Mackinac Tribe of Odawa and Ojibway Indians, with a Durant Census Record number indicating that he was a member of Band 16. Next, he submitted a "Certificate of Degree of Indian Blood" from the United States Department of the Interior Bureau of Indian Affairs. This document certified defendant as "1/64 Mackinac Band Chippewa Indian" and stated that his "maternal great-great-great-grandmother, Mrs. Antoine Paquin, is listed as number No. 342 on the 1836 Census Register of the Ottawa and Chippewa Nations." The letter also informed defendant that, although the document verified his Indian descent, verification did not entitle him to tribal membership. Lastly, defendant submitted his tribal membership card, which identified him as "A Member of The Mackinac Tribe of Odawa and Ojibwa Indians Bands 11 thru 17 and Cheboygan Bands." [*Caswell*, 336 Mich App at 63-66 (citation omitted).]

The district court dismissed defendant's charges, but the circuit court reversed that opinion on appeal. *Id*. at 66-67. "Relying on *Jewell*, the circuit court observed that the Mackinac Tribe was not a federally recognized tribe and concluded that the matter of federal tribal recognition is reserved to the United States Department of the Interior." *Id*. at 67. This Court granted defendant's delayed application for leave to appeal, vacated the circuit court's order, and remanded for an evidentiary hearing. *Id*. at 63.

This Court was tasked with setting forth "the proper legal framework in which to assess whether a defendant is entitled to assert their tribal status as a defense to state fishing regulations." *Id*. at 67. This Court began by noting "that a modern-day tribe whose members descend from a tribe that signed a treaty may be, but is not typically, referred to as a 'signatory tribe.' That designation is usually reserved for the historical tribe whose representatives actually signed a treaty." *Id*. at 68. In contrast, "[a] modern-day tribe that has established its right to exercise the treaty rights of a signatory tribe is often referred to as a 'treaty tribe' (sometimes, 'treaty Indians')."

---

[3] The Ottawa and Chippewa were "loosely confederated and called tribes, [but] their highest political unit was the band." A band is typically composed of 3 to 25 related families living in a particular area. In times of duress, these bands grouped together, forming a clan system. A tribe is essentially composed of bands that have a common identity, but bands are the primary unit of the political organizational structure.

*Id.* Adopting these terms, this meant that "the Mackinac Tribe is not a 'signatory' to the 1836 and 1855 treaties, even though some of its members appear to be descendants of a signatory tribe. The issue is whether it qualifies as a treaty tribe." *Id.*

This Court agreed with defendant that "whether the Mackinac Tribe is federally recognized has no bearing on whether it is entitled to treaty fishing rights." *Id.* at 69. But this Court "disagree[d] that membership in a modern-day tribe whose members descend from a signatory tribe automatically entitles the modern-day tribe to treaty rights." *Id.* Instead, this Court held "that the dispositive issue is whether the Mackinac Tribe is a political successor in interest to a signatory tribe, entitling defendant to an affirmative defense on the basis of his tribal status." *Id.* The district court and circuit court had not addressed this question, *id.*, and neither had Michigan's appellate courts, see *id.* at 71.

This Court examined several cases from the Ninth Circuit, see *id.* at 71-74, and found them to be persuasive in light of the fact that "the Ninth Circuit has handled far more of these cases than apparently any other federal Circuit Court of Appeals in the country, and its reasoning is sound," *id.* at 74. Accordingly, this Court adopted the Ninth Circuit's conclusion "that a tribe's federal-recognition status does not affect its treaty rights." *Id.* This meant that the fact that the Mackinac Tribe had not been federally recognized had no bearing on defendant's affirmative defense. *Id.* Accordingly, this Court concluded that the circuit court erred because it conflated federal recognition "with the contractual and sovereignty-based concepts of tribal treaty rights." *Id.* at 75.

But this Court also held that "[t]he district court erred by assuming that the Mackinac Tribe possessed treaty rights merely because some of its members were descended from signatory tribes of the relevant treaty and by assuming that defendant's entitlement to exercise those rights as a member of the tribe provided him with a valid affirmative defense to the charges against him." *Id.* at 77. Instead, looking again to the Ninth Circuit, see *id.* at 75-77, this Court adopted a test for courts to use when "determining whether a tribe constitutes a treaty tribe," *id.* at 75. This Court concluded that a tribe constitutes a treaty tribe, i.e., a political successor in interest to a signatory tribe, "when a group of citizens of Indian ancestry is descended from a treaty signatory and has maintained an organized tribal structure such that some defining characteristic of the original tribe persists in an evolving tribal community." *Id.* at 78. With the proper legal framework set forth, this Court remanded "to the district court for an evidentiary hearing to allow defendant an opportunity to establish by a preponderance of the evidence that his tribe is a political successor in interest to a signatory tribe of the 1836 treaty." *Id.*

## II. FACTS ON REMAND

In January 2022, the district court conducted an evidentiary hearing, during which defendant presented two witnesses: (1) Dr. James Michael McClurken, a cultural anthropologist who was qualified as an expert in the field of ethnohistory and treaty rights; and (2) Barry Adams,

the prior chairman of the Mackinac Tribe and a direct descendant from the 1836 treaty-signatory, Ainse.[4]

Dr. McClurken testified generally to his historical and anthropological research relating to treaty rights issues for North American tribes; however, he stated that he had done "[a]lmost nothing" to prepare for the trial, and he had not performed any genealogical work on the Mackinac Tribe. Dr. McClurken explained that the Mackinac Band hunted and fished "the south shore of the Upper Peninsula and along the north shore of the Lower Peninsula as well, and they hunted all over the place and had kin ties spread throughout the entire region, but they were centered at Mackinac Island." Dr. McClurken described the Mackinac Band as "a kin group form of extended families who make decisions by consensus based on the relationships to one another for their own best interests."

Adams testified that he and Darryl Brown "went out to find the other Mackinac people" after the Sault Ste Marie Tribe closed its enrollment. Adams explained that he had spent "decades of effort in [their] work to re-establish the Tribe as a collective body for the indigenous bands recognized historically (1870 Field Notes) as Bands 11-17 in the Upper Peninsula." Adams stated that they used certain reference numbers from prior census rolls to determine who was part of the Mackinac Tribe, explaining that "it took us quite a few years. We went and checked . . . the reference number, find that person they're claiming, then we . . . go find her grandmother to make sure that person is an Indian" and "[t]hat they're Mackinac." He stated that they went "all over the place talking to people" as part of this endeavor. Adams agreed it was "hard to find Mackinac people" because of the proof he required to validate enrollment. He indicated that some of the first members he enrolled were his relatives but that the rest of the members were not. As of the date of the hearing, Adams and Brown had enrolled approximately 468 members to the tribe. Adams specifically testified that he was familiar with defendant's genealogy, and that defendant's "great grandmother was in the 1836 treaty."

Adams indicated that the Mackinac Tribe created a constitution and declaration of independence in about 2008, but he maintained that the members of the Mackinac Tribe were related to Indian ancestors even before the United States was formed. Adams stated that the tribe had a "[c]hairman of the conservation" and "[r]ules and regulations"; yet he was unsure of when the Mackinac Tribe started issuing fishing and hunting licenses. Although Adams was also unsure whether the tribe currently had a "conservation officer," he knew that conservation officers had been assigned in the past and, if someone violated regulations, they would be fined.

When asked how the Mackinac Tribe "distinguish[ed] itself from the general population," Adams did not "know how to answer that. Nobody'd know. They don't run around on Mackinac Tribe or anything like that." He testified that they did, however, "have pow wows," "fall gatherings," and "everything that Grand Traverse has or Petoskey or Sault Tribe or anything." He

---

[4] The prosecution called a single witness, Conservation Officer Jon Busken with the "Michigan Department of Natural Resources Law Enforcement Division"; however, Officer Busken did not substantially testify to anything other than the fact that he had never encountered conservation officers or law enforcement from Mackinac Tribe, and he was unaware of any individual being "cited by the Mackinac Tribe for violating any of their hunting or fishing regulations."

agreed that "those kinds of things [were] like culturally distinct to Ottawa people[.]" He also agreed that "the people who are now the Mackinac Tribe" had "always felt themselves to be distinct," explaining that "[t]hey're Indians." Adams further agreed that the tribal gatherings and powwows had occurred even before his enrollment efforts.

## A. THE DISTRICT COURT'S DECISION

In its written decision, the district court noted that the burden was on defendant to establish by a preponderance of the evidence that his tribe was a political successor in interest to a signatory tribe of the 1836 treaty, and the court set forth the test handed down by this Court: "(A) the Defendant is a part of a group of people of Indian ancestry, (B) that the Defendant descended from a treaty signatory tribe, and (C) that that tribe has maintained an organized tribal structure."

For the first prong, the district court concluded that defendant was part of a group of people of Indian ancestry. The court highlighted defendant's evidence establishing that he was descended from an individual on the 1836 census[5] and an individual on the Durant Roll.[6] The court rejected the prosecution's argument that the Mackinac Tribe was not a group of people of Indian ancestry, reasoning that "the testimony of Dr. McClurken and Mr. Adams directly contradict that assertion." The court pointed to Adams's testimony about his being descended from Ainse; that "[h]e and his relatives, as well as others who descended from that tribe, constitute the Mackinac Tribe"; and that the efforts "made to identify those relatives and descendants cannot be ignored."

For the second prong, the district court concluded that defendant was descended from a treaty signatory tribe. The court highlighted Adams's testimony about himself and his relatives being descended from an 1836 treaty-signatory, Ainse. The court explained that

> [w]hile there's no evidence of any other members having directly descended from those identified in the Durant Roll other than the Defendant, that does not lead to the logical conclusion that all members of the Mackinac Tribe are not somehow descendants of the Defendant's members identified on the Durant Roll.

The district court was unpersuaded by the prosecution's argument that Adams's formalization of the tribe meant that it had previously ceased to exist. The court believed that Adams had merely

---

[5] This was a reference to defendant's Certificate of Degree of Indian Blood that showed Antoine Paquin, one of defendant's ancestors, was listed on the "1836 Census Register of the Ottawa and Chippewa Nations." *Caswell*, 336 Mich App at 65.

[6] We believe this was a misstatement by the district court because the court explained that defendant could "trace his lineage to a member of the Durant Roll, Antoine Paquin"; however, the evidence established that Antoine Paquin, was listed on the "1836 Census Register of the Ottawa and Chippewa Nations," *Caswell*, 336 Mich App at 65, not the Durant Roll. Nonetheless, Dr. McClurken testified that each person named on the Durant Roll was a descendant of someone in a band that was a signatory of the 1836 treaty. Therefore, although there was no direct evidence submitted of defendant's connection to the Durant Roll, his lineage to the 1836-treaty tribe suggests that he also descended from an individual on the Durant Roll.

made attempts to reestablish the tribe. The court determined that the tribe "continued to exist through a number of evolutions from the point in time of the signing of the 1836 treaty to today's date." The court further noted "the lineal functioning of the Mackinac Band ancestors acting and participating as a group that had historically acted in its kinship-based government in a continuous manner dating back to the Treaty of 1836."

For the third prong, the district court concluded that the Mackinac Tribe had maintained an organized tribal structure. It incorporated its prior findings, further noting Dr. McClurken's testimony about the history of the tribe and its kinship-based structure. The court noted that the band tied to Ainsse resided in the "area commonly called the Straits of Mackinac," and the Durant-Roll individuals descending from that band lived and worked in the same area into the first three decades of the 20th century. The court stated that despite attempts by the federal government to "assimilate and eliminate the tribes," the band maintained its kinship-based structure and selected representatives "to speak on their own behalf within their tribal units and with other government entities." Under the Roosevelt Administration, all Michigan tribes—including those from the Mackinac region—petitioned under the Indian Reorganization Act. The Northern Michigan Ottawa Association was created to advocate for the various bands, and the bands sent individuals to speak on their behalf. This organization eventually failed, and all but two of the tribes—one of which was the Mackinac Tribe—received federal recognition. The district court rejected the prosecution's argument that the Mackinac Tribe had not been a continuous entity, reasoning that "[t]he iteration varied over time but continued in full strength in spite of the federal government's effort to assimilate the Odawa or Ottawa Nations."

## B. THE CIRCUIT COURT'S DECISION

The prosecution appealed to the circuit court, essentially raising the same arguments now raised on appeal. The circuit court heard argument before affirming the district court's decision, determining that the district court had not clearly erred or abused its discretion in dismissing the charges.

For the first prong, the circuit court highlighted the efforts Adams and Brown took to enroll members of the Mackinac Tribe, including meeting with individuals, taking their names, and comparing their information to genealogical and census records. The court rejected the prosecution's argument that this was insufficient, reasoning that there was no contradictory evidence and that the standard was not the same as federal recognition, which the prosecution maintained. The court determined that Adams's testimony "describing how he confirmed all members of the Mackinac Tribe are of Indian ancestry were sufficient for the District Court to rely on." Accordingly, "[i]t was not clear error or an abuse of discretion to rely on that testimony to conclude that [defendant] had met his burden of proof on this prong."

For the second prong, the circuit court noted that the prosecution conceded to defendant, Adams, and Adams's tribal relatives being descended from a signatory to the 1836 treaty. The court determined that while the prosecution "wants more," it had "again provided no contradictory evidence." Accordingly, the district court's finding was not clearly erroneous nor an abuse of discretion.

For the third prong, the circuit court first determined that defendant "must show that some defining characteristic of the original tribe persists in an evolving tribal community." The court rejected the prosecution's position that the court should "apply standards of state government to tribal government. That is not the test." The court highlighted the kinship-based system and a lack of hierarchical leadership, the shifting federal policy over the many decades, the Mackinac Band's involvement with the Northern Michigan Ottawa Association until the 1980s, the Mackinac Tribe's exploration of federal recognition in the 1990s, the tribe's involvement with the Michigan Commission on Indian Affairs until 2007, the tribe's creation of a constitution and declaration of independence in approximately 2008, and the tribe's attempt to obtain federal recognition in 2011 [i.e., the *Jewell* case]. The court also highlighted the tribe's rules and regulations as well as powwows and gatherings. The court further highlighted how the tribe "has a cultural center, maintains property interests, and advocates through members by intervening in lawsuits." The court determined that such facts showed the tribe exercised cultural influence on its members. While noting that the "tribal structure [had] evolved by necessity over time," it concluded that "the evidence is clear that an organized tribal structure has existed since treaty time." The court once again noted the lack of evidence from the prosecution to rebut or contradict defendant's evidence. Accordingly, the circuit court found that the district court "did not commit clear error or abuse its discretion."

## III. TREATY TRIBE STATUS

On appeal, plaintiff argues that the district court abused its discretion by dismissing defendant's charges on the basis that the Mackinac Tribe is a treaty tribe. We disagree.

### A. PRESERVATION AND STANDARD OF REVIEW

Because the prosecution raised this issue in the district court, it is preserved for appellate review. See *People v Heft*, 299 Mich App 69, 78; 829 NW2d 266 (2012). We review "for an abuse of discretion a trial court's decision on a motion to dismiss charges against a defendant." *Caswell*, 336 Mich App at 69. We sit "in the same position as the circuit court when determining whether the district court abused its discretion." *People v Schurr*, ___ Mich App ___, ___; ___NW3d ___ (2024) (Docket No. 365104); slip op at 8 (quotation marks and citation omitted). An abuse of discretion occurs either when the court's "decision falls outside the range of reasonable and principled outcomes" or when the court's decision relies on an error of law. *Caswell*, 336 Mich App at 69 (quotation marks and citation omitted). We review de novo questions of law. *Id*. We review "for clear error the trial court's findings of fact in a motion to dismiss." *Id*. at 70. Clear error occurs when we are "left with a firm conviction that the trial court made a mistake." *Id*. (quotation marks and citation omitted).

### B. PROPER LEGAL FRAMEWORK

As this Court previously explained, the central question in this case "is whether the Mackinac Tribe is a political successor in interest [i.e., a treaty tribe] to a signatory tribe, entitling defendant to an affirmative defense on the basis of his tribal status." *Id*. at 69. To answer this question, this Court adopted the Ninth Circuit's test in *United States v Washington*, 641 F2d 1368,

1371 (CA 9, 1981).[7]  See *Caswell*, 336 Mich App at 75.  Accordingly, this Court concluded that a group constitutes a treaty tribe "when a group of citizens of Indian ancestry is descended from a treaty signatory and has maintained an organized tribal structure such that some defining characteristic of the original tribe persists in an evolving tribal community."  *Id*. at 78.  On remand, the parties and lower courts recognized that this can be broken up into three prongs: (1) a group of citizens of Indian ancestry that (2) is descended from a treaty signatory and (3) has maintained an organized tribal structure.

This Court explained that "[c]ontinually maintaining an organized tribal structure is the 'single necessary and sufficient condition for the exercise of treaty rights by a group of Indians. . . .' "  *Id*. at 75, quoting *Washington*, 641 F2d at 1372.  This "condition"

> reflects our determination that the sole purpose of requiring proof of tribal status is to identify the group asserting treaty rights as the group named in the treaty.  For this purpose, tribal status is preserved if some defining characteristic of the original tribe persists in an evolving tribal community.  [*Caswell*, 336 Mich App at 75-76, quoting *Washington*, 641 F2d at 1372-1373 (quotation marks omitted).]

To meet this requirement, a tribe need not "have acquired organizational characteristics it did not possess when the treaties were signed," and "changes in tribal policy and organization attributable to adaptation do not destroy tribal status."  *Caswell*, 336 Mich App at 76, quoting *Washington*, 641 F2d at 1373 (quotation marks omitted).  Moreover, so long as tribes survived as "distinct communities," some "assimilation inevitable in response to shifts in federal policy between favoring tribal autonomy and seeking to destroy it" does not automatically result in "the abandonment of distinct Indian communities."  *Id*.

## C. BURDEN OF PROOF

A defendant seeking to invoke treaty-tribe status to avoid criminal charges is invoking an affirmative defense and must prove this defense by a preponderance of the evidence.  See *Caswell*, 336 Mich App at 77-78; see e.g., *People v Propp*, 508 Mich 374, 382; 976 NW2d 1 (2021) ("*The defendant bears the burden of proving an affirmative defense.*") (quotation marks and citation omitted).  "Preponderance of the evidence means such evidence as, when weighed with that opposed to it, has more convincing force and the greater probability of truth."  *People v Cross*, 281 Mich App 737, 740; 760 NW2d 314 (2008) (quotation marks and citation omitted).

As an initial matter, the prosecution argues that the documentary evidence necessary to establish treaty-tribe status is similar to the documentary evidence necessary to support federal tribal recognition.  We disagree.  This Court has already stated that federal recognition is a separate question and has no bearing on exercising treaty rights or defendant's affirmative defense.  See *Caswell*, 336 Mich App at 69-74.  Accordingly, the type and amount of evidence needed for defendant's affirmative defense need not be the same as for federal recognition.  Defendant was instead required to submit enough evidence that "when weighed with that opposed to it, has more

---

[7] This Court referred to this particular decision as *Washington II* because this Court referenced multiple Ninth Circuit decisions with the name "Washington."

convincing force and the greater probability of truth." *Cross*, 281 Mich App at 740. As the circuit court recognized, the prosecution largely failed to offer any evidence in rebuttal, which meant defendant was at an advantage. Nonetheless, the lack of rebuttal evidence from the prosecution is not a silver bullet because defendant still had the burden of proving his affirmative defense. See *Propp*, 508 Mich at 382; *Caswell*, 336 Mich App at 77-78. Therefore, despite the prosecution largely failing to rebut defendant's evidence, defendant still had to satisfy the three-prong test this Court handed down in the prior *Caswell* appeal.

### D. PRONG ONE: A GROUP OF CITIZENS OF INDIAN ANCESTRY

For the first prong, the district court concluded that defendant was part of a group of people of Indian ancestry. The court highlighted defendant's evidence establishing that he was descended from an individual on the 1836 census. The court rejected the prosecution's argument that the Mackinac Tribe was not a group of people of Indian ancestry, reasoning that "the testimony of Dr. McClurken and Mr. Adams directly contradict that assertion." The court pointed to Adams's testimony about his being descended from Ainse; that "[h]e and his relatives, as well as others who descended from that tribe, constitute the Mackinac Tribe"; and that the efforts "made to identify those relatives and descendants cannot be ignored."

Adams testified that he and Brown "went out to find the other Mackinac people" as part of their efforts to reorganize the Mackinac Tribe. Adams described the extensive methods used to determine membership in the Mackinac Tribe, including the use of census rolls and genealogy.[8] Because of the level of proof that Adams required to validate enrollment, their efforts took hard work over the course of many years to accurately ensure that only those who were descended from the Mackinac Bands, i.e., Indian ancestry, were enrolled.

---

[8] Adams indicated that he used genealogy and ancestral records from the following sources when verifying the enrollment applications: "the National Archives and Records Administration"; "Microfilm Publication Record Group 75 Michigan Indians"; "Archives of Quebec"; "Penetanguishene Genealogy and History Group"; "OMFRA Ontario Metis Family Records Center Data Base of Metis and First Nations"; "Collection of The State Historical Society of Wisconsin Birth and Marriages records 1695 [through] 1821"; "Mackinac County, Michigan Land Patents Database 1807 [through] 1907"; "Wisconsin Creoles, Birth and marriages records 1695 [through] 1907"; "The identity of 19th century Ottawa emigrants to Manitoulin Island 18th century"; "St. Joseph Birth and Marriages records 135 [through] 1880"; "St. Ann[e]'s Church Records of Detroit"; "St. Ann[e]'s Church Records of Mackinac Island"; "Index Records St. Ann[e]'s Detroit Birth and Marriages, Church Records by the Traveling Priests (Michigan and Wisconsin)"; "St. Joseph Mission and Holy family Catholic Church records LaPointe Wisconsin Birth and Marriage records"; "Indian Census records Manitoulin Island 1842 [through] 1852"; "Lyons records (University of Michigan) Index List claimants and Maps of area ceded in the Treaty of 1837, Alphabetical arrangement of claims by Family"; "History of the Diocese of Sault Ste. Marie and Marquette Vol 1 [through] 3 by Rev. Antoine Ivan Rezer"; and "History of the beginning of Michigan Names and Family Names History of the Mackinac Straits area Fur Trading Capital of the World, 9 Volumes called Rendezvous of the Straits by Timothy J. Kent."

Although defendant did not produce individualized evidence concerning every member of the Mackinac Tribe, this was unnecessary because Adams testified about the generalized process of enrollment to the tribe. Furthermore, Adams agreed that "the people who are now the Mackinac Tribe" had "always felt themselves to be distinct," explaining that "[t]hey're Indians." From such testimony, the district court could extrapolate to every member of the tribe, especially without rebuttal evidence from the prosecution. The circuit court reached a similar conclusion after highlighting Adams's and Brown's efforts. To the extent that the prosecution attacks Adams's testimony for lack of detail or documentation, this attack relates back to the federal recognition standard, which does not apply, as well as to issues of weight and credibility, which are matters that we defer to the trial court. See *Schur*, ___ Mich App at ___; slip op at 10 n 5, quoting *People v Redden*, 290 Mich App 65, 74; 799 NW2d 184 (2010) ("The district court must consider not only the weight and competency of the evidence, but also the credibility of the witnesses . . . .") Accordingly, contrary to the prosecution's contentions on appeal, there was evidence showing that the Mackinac Tribe was a *group* of citizens of Indian ancestry.

Therefore, we agree with the circuit court that the district court did not clearly err or abuse its discretion when finding that defendant met his burden by a preponderance of the evidence on this first prong.

E. PRONG TWO: DESCENDED FROM A TREATY SIGNATORY

For the second prong, the district court concluded that defendant was descended from a treaty signatory tribe. The court noted Adams's testimony about himself and his relatives being descended from Ainse, explaining:

> While *there's no evidence of any other members* having directly descended from those identified in the Durant Roll other than the Defendant, that does not lead to the logical conclusion that all members of the Mackinac Tribe *are not somehow* descendants of the Defendant's members identified on the Durant Roll. [Emphasis added.]

The court highlighted Adams's enrollment of his relatives to the tribe, which led "to the conclusion that the tribal members of the Mackinac Tribe that are directly related to Mr. Adams trace directly to the Durant Roll, their own lineage." The court also highlighted the fact that defendant could trace his lineage back to Paquin, who, as this Court previously indicated, was listed on the "1836 Census Register of the Ottawa and Chippewa Nations." *Caswell*, 336 Mich App at 65.

Adams testified that he was descended from Ainse, who signed the 1836 treaty, and that defendant's "great grandmother was in the 1836 treaty." This, along with defendant's documentation from the case prior to remand, constituted evidence that Adams and defendant were descended from a treaty signatory; however, this evidence on its own did not mean that the *entire group* was descended from a treaty signatory. Furthermore, Adams's enrollment of his relatives merely established that those relatives were descended from a treaty signatory—it said nothing about the tribe as a group. The court seemed to problematically assume that the remainder of the Mackinac Tribe members were descendants of the Durant Roll simply because there was no evidence showing that they were not such descendants. Such reasoning ignored that the burden was on defendant to prove each prong by a preponderance of the evidence. See *Caswell*, 336 Mich

-11-

App at 77-78. In fact, this Court previously chastised the district court for assuming that the Mackinac Tribe had treaty rights because "*some* of its members were descended from signatory tribes," see *id*. at 77 (emphasis added), which appears to be what the district court again did in this portion of its decision on remand. This error was compounded by the circuit court, which summarily determined that the prosecution conceded that defendant, Adams, and *some* of Adams's relatives were descended from an 1836 treaty-signatory. This was merely a parroting of the district court's same flawed reasoning.

Nonetheless, the district court provided a separate rationale for its conclusion regarding this second prong. It determined that the tribe "continued to exist through a number of evolutions from the point in time of the signing of the 1836 treaty to today's date." The court further noted "the lineal functioning of the Mackinac Band ancestors acting and participating as a group that had historically acted in its kinship-based government in a continuous manner dating back to the Treaty of 1836."

As previously discussed, Adams verified that each member was a descendant of the Mackinac Bands, who had been represented by Ainse, an 1836 treaty-signatory. Accordingly, there *was* evidence that the Mackinac Tribe—the 468 individuals Adams registered as tribe members—was a group descended from a treaty signatory. Therefore, although one portion of the district court's rationale was problematic, the remainder of its rationale was sound because it addressed the group as a whole rather than just defendant, Adams, and Adams's relatives. To the extent that the lower courts erred, we hold that any error was harmless. See MCR 6.001(D); MCR 2.613(A) ("[A]n error in a ruling . . . is not ground for . . . vacating, modifying, or otherwise disturbing a[n] . . . order, unless refusal to take this action appears to the court inconsistent with substantial justice.").

F. PRONG THREE: MAINTAINED AN ORGANIZED TRIBAL STRUCTURE

For the third prong, the district court relied extensively on Dr. McClurken's testimony regarding the history of the Mackinac Bands and concluded that the Mackinac Tribe had maintained an organized tribal structure from 1836 to the present day. It referenced the kinship-based structure, the Durant Roll, the common area in the Straits of Mackinac, the termination periods, the petition under the Indian Reorganization Act, and the Northern Michigan Ottawa Association. As the court explained, "[t]he iteration varied over time but continued in full strength in spite of the federal government's effort to assimilate the Odawa or Ottawa Nations."

Although Dr. McClurken had not performed any genealogical work on the Mackinac Tribe, Adams's testimony filled in the "gaps." As previously discussed, Adams and Brown tracked down members of the various Mackinac Bands and identified the Mackinac Tribe. They used genealogy and census records to accurately identify descendants of the Mackinac Bands. The exact date that Adams and Brown began to do this is somewhat unclear, but Adams's testimony suggests it began between 1978 and the 1990s. The Mackinac Tribe was part of the Northern Michigan Ottawa Association through the 1980s and sought but failed to obtain federal recognition from the 1990s through 2011. The Mackinac Tribe was involved with the Michigan Commission on Indian Affairs until 2007 and had a constitution and declaration of independence, which appear to have been created in 2008. The tribe issued fishing and hunting licenses, had a chairman of the conservation,

and had rules and regulations that, if not followed, resulted in fines. The tribe also had powwows and gatherings that were culturally distinct.

The prosecution's position improperly requires a formalized governmental structure akin to modern-day structures; however, this Court previously explained that "tribal status is preserved if some defining characteristic of the original tribe persists in an evolving tribal community." *Caswell*, 336 Mich App at 76, quoting *Washington*, 641 F2d at 1372-1373 (quotation marks omitted). Moreover, "changes in tribal policy and organization attributable to adaptation do not destroy tribal status," and so long as tribes survived as a "distinct communities," some "assimilation inevitable in response to shifts in federal policy between favoring tribal autonomy and seeking to destroy it" was permitted and did not automatically result in "the abandonment of distinct Indian communities." *Caswell*, 336 Mich App at 76, quoting *Washington*, 641 F2d at 1373 (quotation marks omitted).

This appears to be the case for the Mackinac Bands. While the nature of the Mackinac Bands may have evolved over time, there were nonetheless defining characteristics—the kinship-based structure, connection to the Mackinac region, fishing, powwows—as well as less modern political structures that survived from 1836 until the present day. The circuit court recognized this in its decision, and we are not left with a firm conviction that the district court's findings were mistaken. We also agree with the district court that Adams's testimony cannot fairly be characterized as "creating" the Mackinac Tribe out of thin air. Rather, his testimony is best understood in context to be a reestablishment of the various bands under a more central organization after many decades of turmoil and strife. Even his affidavit used the word "re-establish" rather than "create."

Therefore, we agree with the circuit court that the district court did not clearly err or abuse its discretion when finding that defendant met his burden by a preponderance of the evidence on this prong.

## IV. CONCLUSION

In sum, defendant presented evidence to support the district court's conclusion that the Mackinac Tribe was a group of citizens of Indian ancestry that is descended from a treaty signatory and that has maintained an organized tribal structure. And, because the circuit court did not err in affirming the district court's dismissal order, we affirm the circuit court's order.

/s/ Kathleen A. Feeney
/s/ Stephen L. Borrello
/s/ Anica Letica

-13-